UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **STEPHEN MUSILINO, et al.,** } | |
| } | |
| Appellants, } | |
| } | |
| v. } | Case No.: 1:15-cv-00053-RDP |
| } | |
| **ALABAMA MARBLE COMPANY, INC.,** } | |
| et al., } | |
| } | |
| Appellees. } | |

# MEMORANDUM OPINION

This case is before the court on the Motion to Dismiss Appeal as Equitably Moot (Doc. 7), filed on February 10, 2015. The Motion (Doc. 7) was filed by Appellees Alabama Marble Company, Inc. (the "Debtor"), Blue Devil Investments, Inc. ("Blue Devil"), David Luce ("Luce," and together with Blue Devil, the "Luce Parties"), TBGS Quarry, LLC ("TBGS") and Credit Strategy Advisors, Inc. ("CSA"). It has been fully briefed. (Docs. 13, 16).

The Motion (Doc. 7) arises in the context of an appeal filed by Stephen Musilino ("Musilino"),[1] Mediterranean Exports, Inc., and Sycamore Marble, Inc. (together with Musilino, the "Appellants"). The appeal was taken from the Order Approving Joint Motion to Approve Compromise and Dismissing Chapter 11 Case (Doc. 3-26),[2] dated November 6, 2014 (the "Rule 9019 Order") of the Honorable James J. Robinson, United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court"). Judge Robinson approved a comprehensive settlement agreement (the "Settlement Agreement") negotiated pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and then dismissed this Chapter 11 case.

---

[1] Appellee's briefs reference Appellant as "Musolino"; however, the correct spelling appears to be "Musilino."

[2] For clarity, the court references the record on appeal as labeled by the Clerk of the Court.

This case arises from the Debtor's (a marble quarrier) troubled demise.  After suffering years of operating at a loss, Debtor's creditors ran out of patience and TBGS (Debtor's landlord) attempted to terminate Debtor's Lease.  Quarry-less and insolvent, Debtor was unable to survive as a going concern.  Debtor sought bankruptcy protection under Chapter 11.  The complex bankruptcy case was soon tainted by internal power struggles and rank opportunism.  As the estate hemorrhaged from protracted litigation, a successful reorganization was unlikely.  With an eye toward the quarrying business, TBGS offered a compromise, which would allow TBGS unchallenged possession of the Quarry in exchange for a significant payout.

Finding TBGS's offer to be the only means for creditor's recovery, an apprehensive Bankruptcy Court ultimately approved the Settlement Agreement.  In the over eight months since the appeal was filed, the settlement has been fully consummated.  In the interim, Appellants never sought a stay of the Bankruptcy Court's order.  Appellants, no longer interested in quarrying for Alabama white dimensional marble, do not now wish to completely unwind the consummated settlement.  Rather, Appellants prefer the court to remand the settlement agreement for a redistribution of the Luce Parties' payout.

In this appeal, Appellants argue that the Settlement Agreement was premised on the Luce Parties' exaggerated secured claims.  Appellees' Motion (Doc. 7) contends that the court can no longer grant effective relief, and, therefore, the appeal is due to be dismissed as equitably moot.  After a careful review of the record and arguments in this case, the court concludes that Appellees' Motion (Doc. 7) is due to be granted and the appeal is due to be dismissed.

**I.      Background**

Below is a brief background of the litigation, which is instructive to the court's analysis of the arguments raised in this Motion (Doc. 7).

### A.     The Parties

#### 1.     Debtor

Debtor is a privately held company founded by Musilino in 1997. (Doc. 2-2, at 9). Debtor is equally owned by Musilino and Luce. (*Id.*; *see also* Doc. 3-4). From 1998 through November 2014, Debtor mined and operated a marble quarry in Talladega County, Alabama, near the town of Sylacauga (the "Quarry"). (Doc. 3-5, at 2 ¶ 5-6). At the Quarry, Debtor mined Alabama white dimensional marble and operated a marble fabrication shop that cut and polished marble. (Doc. 2-2, at 9). Debtor sold marble to various suppliers and directly to consumers for use in a variety of construction and other projects. (*Id.*). Debtor's employees (other than the Quarry manager) are leased from a third-party (First Star HR/Essential HR, Inc.). (*Id.*). Additionally, much of Debtor's bookkeeping is performed by Appellant Mediterranean Exports, Inc., a company wholly owned by Musilino. (*Id.*).

The Quarry was operated in accordance with a ground lease (the "Lease"), which Debtor entered into with Purple Mountain Marble Co., Inc. ("PMCC"), dated November 4, 1998. Debtor and PMMC extended the term of the Lease through December 31, 2019. (*Id.* at 14).

#### 2.     TBGS

On August 23, 2013, PMMC entered into a contract to sell the Quarry to TBGS. That contract was later amended to give TBGS the right to take actions on behalf of PMMC to terminate the Lease with Debtor. On December 2, 2013, PMMC sent Debtor a notice that it was terminating the Lease. (*Id.*). Following this notice of termination, Debtor and TBGS litigated the validity of the Lease, a dispute which eventually played out in the Bankruptcy Court.[3] (*Id.* at 15).

---

[3] On March 18, 2015, this court consolidated two separate bankruptcy appeals from Bankruptcy Court orders related to the termination and assumption of the Lease between TBGS and Debtor with this appeal. The

3

### 3. CSA

On or around April 8, 2014, CSA acquired all interest, rights, and obligations arising under a series of notes and security instruments held by Debtor's judgment creditors. (*See* Doc. 2-2, at 10, 23-24; *see also* Doc. 8, at 14). The notes and security interests were previously held by Howard and Martha Steinberg (the "Steinbergs") and Overlook Investment Company, LLC, ("Overlook") (the Steinbergs and Overlook collectively, are referred to as the "Original Holders"). (Doc. 2-2, at 11). The Original Holders sued to enforce their notes and interests and obtained monetary judgments for the approximate principal amount of $595,000. (*Id.*). This resulted in certain of Debtor's accounts being frozen and Debtor being unable to access cash on hand. (*Id.*). CSA purchased these interests during the Chapter 11 case and became one of Debtor's secured creditors. (*See id.* at 13).

### 4. Luce Parties

In 2009, Luce began investing in Debtor by making both capital contributions and loans. In 2010, Debtor restructured its equity ownership. (Doc. 3-5, at 3 ¶ 9). During this process, Luce made a capital contribution that provided Luce 50% of Debtor's common equity ownership; Musilino retained the other 50% ownership stake. (*See id.*; Doc. 3-2, at 4). Thereafter, Debtor became financial distressed and highly leveraged. (*See* Doc. 3-5, at 3-4). Luce agreed to loan more funds if Overlook, the Steinbergs, and Musilino consented to Luce's loans being senior to those of Overlook, the Steinbergs, and Musilino. (*Id.* at 4 ¶11). According to Luce, from 2010 to the petition date, Luce loaned approximately $1,500,000 to allow Debtor to satisfy its day-to-day obligations, including payroll and operating expenses, and perform on its contracts with customers. (*See* Doc. 8, at 15).

---

Settlement Agreement at issue here purports to resolve those disputes entirely. Therefore, because this court finds the instant appeal equitably moot, the other appeals are also moot.

Nevertheless, Debtor still required additional funds.  On April 13, 2013, Blue Devil and Debtor entered into a senior credit facility (the "Blue Devil Loan"), pursuant to which Blue Devil provided a loan in the total amount of $600,000, secured by substantially all of Debtor's assets. (Doc. 3-5, at 3 ¶ 10).  As of the date of the Settlement Agreement, Appellants contend that the amount owed by the Debtor on account of the Blue Devil Loan, including accrued fees and interest, was approximately $800,000.  (Doc. 8, at 15).

B.      The Bankruptcy Court Proceedings

The Debtor voluntarily commenced its Chapter 11 case on February 7, 2014.  (Doc. 3-2). The Debtor sought Chapter 11 protection because of collection efforts by the Original Holders, which, as discussed above, left Debtor unable to access cash.  (Doc. 3-5, at 4 ¶¶ 14-17).  In addition, Debtor's ongoing litigation against TBGS over the Lease, threatened to halt Debtor's mining operations.  (*Id.*).

1.      **Leasehold Dispute**

TBGS argued in the Bankruptcy Court that the Lease was terminated prior to the bankruptcy, and, therefore, the Lease should revert back to TBGS and could not be assumed in Debtor's Chapter 11 case.  (*See* Doc. 2-1).  Without a lease to assume, Debtor would not have a quarry to operate and could not propose a go-forward restructuring plan.  Thus, Debtor's ability to put forth a proposed plan of reorganization was dependent upon the Bankruptcy Court's findings with respect to the questions of whether (1) the Lease was terminated and (2) Debtor could assume the Lease.

The Bankruptcy Court conducted a five-day evidentiary hearing on whether the Lease was terminated and, if it was not terminated, whether it could it be assumed by Debtor.  (*See id.* at 3)  Numerous witnesses testified, including the parties' principals, their employees and agents,

and several expert witnesses. (*See id.*). Over 250 exhibits were admitted, and lengthy post-trial briefs were submitted by the Debtor and TBGS, respectively. (*See id.*). On August 8, 2014, the Bankruptcy Court entered an order finding that the Lease was not terminated and deferring the question of whether to approve Debtor's assumption of the Lease. (*Id.* at 15). Thereafter, Debtor had the opportunity to propose a plan of reorganization that would demonstrate Debtor's future viability. Not surprisingly, Debtor's continued viability required further capital contributions.

On August 27, 2014, Debtor filed its Plan of Reorganization and related Disclosure Statement (the "Debtor Plan"), which was premised on additional funding from Blue Devil. (Doc. 2-2, at 20; Doc. 2-3). The Debtor Plan was signed by Luce as Debtor's authorized representative, without any objection by Musilino. (Doc. 2-3, at 19). On the same day, TBGS filed its competing Plan of Liquidation and related Disclosure Statement (the "TBGS Plan"). (*See* Doc. 1-1, at 45).

### 2. The Settlement Agreement

Uncertainty about future judicial rulings and increasing costs associated with continued litigation often form favorable "laboratory" conditions for a settlement. That is exactly what occurred here. Eventually, the parties reached an agreement to resolve their dispute. On September 29, 2014, Debtor filed a Joint Motion to Approve Compromise and Dismiss Chapter 11 Case jointly with Blue Devil, David Luce, CSA, and TBGS, seeking court approval of the settlement and dismissal of the bankruptcy case (the "Rule 9019 Motion"). (Doc. 3-10). The initial terms of the proposed compromise provided that TBGS would pay Debtor $2,750,000 and waive its pre-petition and post-petition claims against Debtor. (*See id.*). The proceeds from the agreement would have provided $400,000 to the administrative claimants in the Bankruptcy

Case, $50,000 to all "trade creditors" (presumably the general unsecured creditors), $100,000 to CSA (with the right to pursue the remainder of their secured claim against Sycamore Property), and up to $2,750,000 to the Luce Parties. (*Id.* at 21-22). In addition, the Lease was to be terminated, but the Debtor was granted the right to remove all of its machinery and equipment from the Quarry. (*Id.* at 22). It is not clear what, if anything, the Musilino Parties were to receive under this version of the Settlement Agreement. The Rule 9019 Motion also sought a dismissal of the Chapter 11 case following approval of the Settlement Agreement. (*Id.* at 1). The Settlement Agreement was signed by each of the Debtor, Luce, Blue Devil, CSA, and TBGS. (*Id.* at 26-29).

### 3. The Objections and Supplements

Appellants, Lee R. Benton and the law firm of Benton & Centeno, LLP ("Benton") (Doc. 3-12),[4] Miles Supply, Inc. ("Miles") (Doc. 3-13), and the J. Thomas Corbett, U.S. Bankruptcy Administrator for the Northern District of Alabama (the "Bankruptcy Administrator") (Doc. 3-14) filed objections to the Rule 9019 Motion. The objections generally focused on the allegedly inequitable distribution of settlement proceeds.

On October 23, 2014, Appellees filed a Supplement to Joint Motion to Approve Compromise (Doc. 3-18), which generally argued that "the Settlement Agreement represents the only path forward that will provide a distribution of funds to unsecured creditors." (*Id.* at 1). The Supplement suggested that the secured lenders (presumably, the Luce Parties and CSA) had "secured claims well in excess of $3,000,000 (objectors refer to these debts as equity)" and where contributing $450,000 of their own collateral to pay administrative creditors ($400,000) and unsecured creditors ($50,000 to be distributed pro rata). (Doc. 3-18). Without the

---

[4] Benton contested the proposed settlement agreement because it was claiming an attorneys' lien on proceeds to be distributed to the Luce Parties.

Settlement Agreement, the Supplement asserted, the Debtor would be administratively insolvent, leaving the unsecured creditors without any recovery.  (*Id.*).

In an objection following the Debtor's first Supplement, the Bankruptcy Administrator argued that nothing in the Bankruptcy Case substantiated the assertion that the Luce Parties and CSA had secured claims in "excess of $3,000,000."  (Doc. 3-19, at 2).[5]  Instead, the Bankruptcy Administrator recounted evidence suggesting CSA had a secured claim of $595,213.95; Blue Devil had a pre-petition secured claim of $600,000; Blue Devil had a post-petition administrative claim for DIP financing of $100,000; and the Luce Parties and other insiders had many large *unsecured* claims.  (*Id.* at 2-3).  Based on the contention that the parties' secured claims fell short of their $3,000,000 assertion, the Bankruptcy Administrator argued that the funds being distributed pursuant to the Settlement Agreement were, at least in part, property of the estate. (*Id.* at 3).  Therefore, the Administrator argued, the distribution was not exempt from the Bankruptcy Code's absolute priority rule.  Thereafter, other parties similarly objected.  A second Supplement to the Motion to Compromise was filed on October 31, 2014 (Doc. 3-24).

### 4. The Rule 9019 Motion Hearing

On November 4, 2014, the Bankruptcy Court held a hearing to consider the Rule 9019 Motion and the parties' objections (the "Rule 9019 Hearing").  (Doc. 30).  At the Rule 9019 Hearing, the Bankruptcy Court addressed the Luce Parties assertion that over $3,000,000 in secured claims existed.  The Appellants asked that the secured creditors prove the amount they claimed, noting that no proof of claim had yet been filed.  The attorney for Luce conceded that it could not produce security documents to support the claim of the Luce Parties' secured status.  (*Id.* at 90-91).  Apparently, the Luce Parties have entered into certain inter-creditor agreements

---

[5] In addition, the Bankruptcy Administrator objected to the Supplement's inclusion of professional fees to Michael Fox of Olshan Frome Wolosky LLP.

8

that purport to place the Luce Parties' debt ahead of CSA. (*Id.*). Regardless, the Bankruptcy Court decided to forgo taking evidence on the matter.

By the end of the Rule 9019 Hearing, the parties had reformed the terms of the proposed settlement agreement, thereby seemingly resolving the objections of Miles, Benton, and the Bankruptcy Administrator. The new terms of the Settlement Agreement contemplated a distribution to unsecured creditors of $125,000, a distribution of $2,675,000 to the Luce Parties, TBGS's unchallenged possession of the Quarry, the reversion of the equipment in the Quarry to Musilino,[6] and mutual releases among Debtor, TBGS, CSA, and the Luce Parties.[7] (*See* Doc. 3-26 (amending Doc. 3-10)). The Debtor continued to argue that, if the Settlement Agreement was approved, dismissal was warranted because the Debtor had no going concern value to preserve or property available other than the settlement funds to be distributed to creditors. (*See* 3-30, at ). TBGS made it clear that the Settlement Agreement only made sense if TBGS could get immediate access to the Quarry to "get working." (Doc. 3-30, at 76:4-5).

At the conclusion of the hearing, over the Musilino Parties' sole objection, the Bankruptcy Court approved the Settlement Agreement and dismissed the Chapter 11 case. (Doc. 3-30, at 94:16-17). On November 6, 2014, the Bankruptcy Court entered an accompanying Order granting the Joint Motion to Approve Compromise and Dismiss Chapter 11 Case (the "Settlement Order"), overruling the objections of Appellants. (Doc. 3-26). Appellants filed their Notice of Appeal the next day, on November 7, 2014. (Doc. 1-5).

---

[6] Musilino testified this equipment has value in excess of $2,000,000. (Doc. 3-5, at 2 ¶ 7; *see also* Doc. 7-2 (filing of February 27, 2014, which suggests Debtor's equipment value could equal $2,555,000)).

[7] Appellees argue these releases are of significant value to the Luce Parties and TBGS because litigation was pending between the parties and the Settlement Agreement released all claims associated with that litigation.

9

### C. The Consummation of the Settlement Agreement

On November 18, 2014, Debtor (under the direction of Luce), the Luce Parties, TBGS, and CSA entered into a Closing Agreement and Waiver (the "Closing Agreement") whereby the parties explicitly agreed to waive the provision in paragraph 4 of the Settlement Agreement that conditioned the "Effective Date" on the Settlement Order "becoming final and non-appealable." (Doc. 7-3, at 3 ¶ 2). Pursuant to the Closing Agreement, the Settlement Agreement became effective on November 19, 2014. After entering into the Closing Agreement, Appellees contend, and Appellants do not dispute, that the transaction was fully consummated. As a result, the following actions have reportedly occurred:

- All funds and property have been distributed and paid in accordance with the terms of the Rule 9019 Order, the Settlement Agreement, and the Closing Agreement;
    - All non-insider, unsecured creditors received a pro rata share of a $125,000 distribution (a 40% recovery on their claims).
    - Debtor's administrative creditors of Debtor were paid in full.
    - TBGS has paid the funds to Luce and Blue Devil in accordance with the terms of the Settlement Agreement.
    - Luce received the funds in accordance with the Settlement Agreement.
- Debtor fully wound down its operations;
    - Debtor terminated all its employees.
    - Debtor completed any outstanding customer orders.
    - Nearly all inventory has been removed from the Quarry.
    - Debtor has vacated the Quarry.
- Musilino was allowed to remove and retain Debtor's equipment, purportedly valued at more than $2.5 million;
- TBGS has taken possession of the Quarry and, according to Appellees, has already made improvements;
- Lawsuits against Luce were voluntarily dismissed with prejudice; and
- TBGS obtained a state court judgment requiring Debtor to vacate the Quarry (which Debtor consented to as part of the Settlement Agreement).

(*See* Doc. 7, at 3-4; Doc. 16, at 2-3).

10

Appellants argue that Appellees effort to consummate the Settlement Agreement "was a transparent attempt by Appellees to undercut Appellants' right of appeal and should not be rewarded." (Doc. 13, at 6). However, Appellants never responded to Appellees' notice that the Closing Agreement was executed, and Appellants have not sought a stay Appellees' efforts to consummate the Settlement Agreement.

## II. Standard of Review

The court reviews *de novo* the Bankruptcy Court's determinations of law.[2]  *In re Club Assocs.*, 956 F.2d 1065, 1069 (11th Cir. 1992). The Bankruptcy Court's factual findings are reviewed under the clearly erroneous standard. *Id.*

## III. Discussion

Appellees argue that the court should dismiss the appeal as equitably moot because the Settlement Agreement has been both approved by the Bankruptcy Court and fully consummated, and this court is no longer able to provide effective relief. (Doc. 7, at 1). Appellants assert that their appeal of the Bankruptcy Court's Rule 9019 Order is not moot because this court can afford them the relief they seek by *partially* unwinding the monetary distributions already undertaken pursuant to the consummated Settlement Agreement.

Equitable mootness "is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of the judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *In re Allied Holdings*, No. 1:07-CV-01455WSD, 2007 WL 2750646, at *2 (N.D. Ga. Sept. 19, 2007) (quoting *Mac Panel Co. v. Va. Panel Corp.,* 283 F.3d 622, 625 (4th Cir. 2002)) *aff'd sub nom. In re Allied Holding, Inc.,* 291 F. App'x 257 (11th Cir. 2008). The Eleventh Circuit has consistently held that the mootness doctrine, as applied in a bankruptcy proceeding, "permits the courts to dismiss an

11

appeal based on its lack of power to rescind certain transactions." *In re Winn-Dixie Store, Inc.*, 286 F. App'x 619, 622 (11th Cir. 2008), quoting *In re Holywell Corp.*, 911 F.2d 1543 (11th Cir. 1990), *rev'd on other grounds by Holywell Corp. v. Smith*, 503 U.S. 47 (1992).  Central to a finding of mootness is a determination that the district court, sitting in its appellate capacity, can no longer grant "effective judicial relief."  *In re Club Assocs.*, 956 F.2d at 1069.  The burden of establishing mootness is on the party seeking dismissal.  *In re VOIP, Inc.*, 461 B.R. 899, 904 (S.D. Fla. 2011), citing *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 738 (S.D. Fla. 2010); *Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009).

Courts in this circuit have relied on various factors when deciding whether effective judicial relief is still possible.  These include whether:  (1) the challenged settlement agreement has been substantially consummated, *see In re Club Assocs.*, 956 F.2d at 1069; (2) the settlement agreement can be unwound, *see In re VOIP*, 461 B.R. at 902-03; and (3) the appellant sought a stay of the Bankruptcy Court's order approving the settlement agreement, *see In re Club Assocs.*, 956 F.2d at 1070 n.13; *In re Winn-Dixie Store*, 286 F. App'x at 624.  There is not a single factor which is designed to (alone) perfectly resolve whether a court can grant effective relief.  After carefully considering all of these factors, and for the reasons outlined below, the court concludes that Appellees have carried their burden of demonstrating that effective relief is no longer available.

### A. The Settlement Agreement Has Been Completely Consummated

It is beyond dispute that the Settlement Agreement has been *completely* (not merely "substantially") consummated.  This factor plainly supports a determination that the appeal due to be dismissed as equitably moot.  *In re Club Assocs.*, 956 F.2d at 1069.  However, the court must still consider all the circumstances of the case to decide whether it can grant effective relief.

*Id.* ("Even if substantial consummation has occurred, a court must still consider all the circumstances of the case to decide whether it can grant effective relief.").

**B.     The Settlement Agreement Cannot Be Unwound**

When reviewing settlement agreements,[8] courts have looked to see if an appellate court can easily "unwind" the settlement, such as when a settlement is "limited to a small number of parties, all before the court, and presents issues involving the transfer of money and *not real property*." *In re VOIP*, 461 B.R. at 902-03 (emphasis added), quoting *In re Cavic*, 380 F. App'x 611, 612 (9th Cir. 2010); *see also In re Healthco Int'l, Inc.*, 136 F.3d 45, 49 (1st Cir. 1998); *In re Chateaugay Corp.*, 167 B.R. 776, 779 (S.D.N.Y. 1994); *In re Delta Air Lines, Inc.*, 374 B.R. 516, 522-25 (S.D.N.Y. 2007).  Thus, the question becomes this:  Can the court unwind the settlement with relative ease, in order to provide effective relief?  The clear answer to this question is no.  Unwinding the consummated Settlement Agreement would result in precisely the "nightmarish situation" that the doctrine of equitable mootness exists to avoid.  *See In re VOIP*, 461 B.R. at 903, quoting *In re Public Service Co. of N.H.*, 963 F.2d 469, 475 (1st Cir. 1992).

The parties' consummation of the Settlement Agreement resulted in numerous irreversible transactions. The Settlement Agreement was the result of extended negotiations and represented a compromise balancing the interests of Debtor, its shareholders, its creditors, and its landlord.  The Bankruptcy Court held a lengthy hearing on the Settlement Agreement on November 4, 2014.  Following the Rule 9019 Hearing, on November 6, 2014, the Bankruptcy Court entered the Rule 9019 Order, approving the Settlement Agreement.  Since that time, Debtor has ceased business operations.  The Quarry has been transferred into the possession of

---

[8] Although the doctrine of equitable mootness is most commonly applied to avoid disturbing plans of reorganization, the doctrine is also invoked in appeals from other kinds of Bankruptcy Court orders.  *See, e.g.*, *Delta Air Lines*, 374 B.R. at 522-25 (order approving settlement agreement); *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 586-90 (D. Del. 2009) (liquidation plan); *Aurelius Capital Master, Ltd. v. Tousa Inc.*, Nos. 08–61317–CIV, 08–61335–CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009) (cash-collateral order).

TBGS.  Various releases have been granted.  Lawsuits have been dismissed.  All monetary distributions contemplated by the Settlement Agreement have been made.  And all inventory and equipment have been removed from the Quarry.  These actions have clearly and significantly affected not just the Debtor, but also TBGS, CSA, the Luce Parties, and Appellees (as well as the other creditors of the estate).

Courts are more inclined to invoke the doctrine of equitable mootness when, as here, real property has been transferred as part of an approved Settlement Agreement.  *See In re VOIP*, 461 B.R. at 902-03 (noting an appellate court can more easily "unwind" a settlement "involving the transfer of money and *not real property*." (emphasis added)).  Indeed, the undisputed record evidence indicates that Quarry real property has been transferred to TBGS under the Settlement Agreement, and TBGS has obtained a consent judgment in its unlawful detainer action in Talladega County District Court.  (Doc. 16-1, at 2).  Even if this court concluded that it could otherwise unwind Settlement Agreement (and, to be clear, the court does not think that is possible), there could be sticky *Rooker-Feldman* doctrine issues associated with taking action that could be viewed as interfering with a state court judgment.[9]

Appellants seem to acknowledge this difficulty.  Indeed, they do not offer any solution to the practical problem of unwinding the Settlement Agreement.  Instead, Appellants focus on the ease in which a court could provide relief in the case of a (hypothetical) bifurcated settlement

---

[9] Generally, the *Rooker-Feldman* doctrine provides that "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Nicholson v. Shafe*, 558 F.3d 1266, 1268 (11th Cir. 2009), quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006).  Certain consent judgments may not be subject to *res judicata* or the *Rooker-Feldman* doctrine's prohibitions in instances where allegations are made that a debtor attempted to fraudulently transfer property to a creditor outside of the bankruptcy process.  *See In re Al-Karim, Inc.*, 529 B.R. 366, 373-74 (Bankr. N.D. Ga. 2015), citing *Pepper v. Litton*, 308 U.S. 295 (1939); *In re XYZ Options, Inc.*, 154 F.3d 1262 (11th Cir. 1998).  However, these cases are inapposite.  Before obtaining the consent judgment, Debtor and TGBS executed a Settlement Agreement that was approved by the Bankruptcy Court in proceedings that Appellants were party to, the record does not reveal any basis for the court to conclude that TBGS obtained its consent judgment fraudulently.

agreement. However, the court's ability to grant effective relief in this appeal necessarily hinges on the ability of the court to unwind the *entire* settlement agreement.

Appellants contend that "[t]he Settlement Agreement is actually comprised of two distinct compromises.  The first is a settlement between Debtor and its landlord, TBGS, . . . . The second is a settlement between the Debtor and certain select creditors, principally insiders Luce and Blue Devil."  (Doc. 13, at 4).  Within this "second" settlement, Appellants only challenge Debtor's $2.675 million payout to the Luce Parties, alleging that it was premised on the Luce Parties holding secured claims in an exaggerated amount. (Doc. 13, at 4).  Obviously, it stands to reason that Appellants' hope that by narrowing the scope of the courts' inquiry the court will find it less challenging to provide effective relief.[10]  Although Appellants do not precisely state what relief they are seeking, it appears that Appellants envision this court vacating the Rule 9019 Order only to the extent it provides payment to the Luce Parties and remanding to the Bankruptcy Court for a determination as to the priority of the creditors' claims with respect to the $2.675 million.  (*Id.*).  Appellees counter by asserting that the Settlement Agreement embodies an "integrated, global resolution" of the Debtor's Chapter 11 case, which cannot now be "unwound, broken apart, and then put back together again."  (*See* Doc. 16, at 2).  Appellees have the better position in the argument.

A review of the record demonstrates that Appellants' proposed partial relief would be ineffective because it would necessarily reform the parties' Settlement Agreement to reflect an agreement that no party intended or contemplated.  When approving the Settlement Agreement,

---

[10] For example, Appellants' argue that "*[w]ith regard to the creditor aspect of the Settlement Agreement*, this case is similar to *In re Voip*, where the court found that 'unwinding' a settlement involving the transfer of money is easily accomplished and that undoing a monetary settlement would not present a 'nightmarish situation for the bankruptcy court on remand.'" (Doc. 13, at 4) (emphasis added) (internal citation omitted). In Appellants' view, effective relief is possible if the court is willing to reform only the Luce Parties' payout while leaving the remainder of the Settlement Agreement (including the real property transfers) intact.

the Bankruptcy Court faced a complex multiparty bankruptcy dispute. The Settlement Agreement represented a comprehensive compromise that satisfied various parties with distinct (and often conflicting) interests. Debtor filed the Rule 9019 Motion jointly with Luce (creditor and shareholder), Blue Devil (creditor), CSA (creditor), and TBGS (Debtor's landlord). Although the Rule 9019 Motion was initially opposed by multiple non-insider creditors, the Rule 9019 Hearing resolved the objections of Miles, Benton, and the Bankruptcy Administrator, leaving Appellants' sole objection outstanding. The Bankruptcy Court approved this near-consensus outcome. To stumble in now and break the Settlement Agreement into divisible parts -- approving some, while unwinding and remanding others -- would arbitrarily reform the parties' bargain into a new agreement. The parties did *not* (as Appellants suggest) reach two agreements, one purely financial. Rather, they reached one complex comprehensive agreement that had both financial and non-financial terms.

Appellants have confirmed the complexity and interconnectedness of the issues the parties faced in settlement negotiations. The releases granted by Luce demonstrate the futility of Appellants' approach to segmenting various portions the Settlement Agreement. Blue Devil and TBGS emphasized at the Rule 9019 Hearing that the payment to Luce was not being made solely for his status as a secured or unsecured creditor, but, in large part, because Luce was able to provide various releases that TBGS found necessary to entering into a deal.[11] (Doc. 3-30, at 74:21-25, 94:7-17). It would be inappropriate for the court to parse and remand only those portions of the Settlement Agreement that would allow Appellants to pursue its financial relief.

---

[11] The record is clear that absent the consideration provided by TBGS not only would the challenged Settlement Agreement fall apart, but the Chapter 11 case likely would have to be converted into a Chapter 7 case. In such a situation, the unsecured creditors would likely walk away with little to no recovery. (*See* Doc. 3-30, at 10:17-12:15, 14:23-16:2). In addition, the court notes the Bankruptcy Court received testimony at the Rule 9019 Hearing indicating that no causes of action on the Leasehold dispute would accrue to the benefit of any trustee in a future Chapter 7 case. (*See* Doc. 3-30, at 11:7-20). Finally, if the Settlement Agreement had not been reached, the assets of the estate would continue to dwindle with the parties' protracted and contentious litigation.

16

The Settlement Agreement must stand or fall as a whole; that is, it must remain intact or be completely unwound. Because the court concludes that it is not possible to unwind the consummated Settlement Agreement, this appeal is equitably moot.

> **C. Appellants' Failure to Pursue a Stay in This Matter Resulted in the Consummation of the Settlement Agreement, Precluding the Court from Granting Effective Relief.**

When a party has failed to seek a stay of the confirmation order pending appeal to the district court, "for practical reasons it is often difficult for courts to afford relief to the appealing party because the court is unable to rescind transactions taken in consummation of the reorganization plan and confirmation order enforcing said plan." *In re Winn-Dixie Store*, 286 F. App'x at 623, citing *In re Club Assocs.*, 956 F.2d at 1070 n.13; *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1555 (11th Cir. 1988) (noting that dismissal of an appeal on grounds of mootness is often granted when an appeal that ultimately reversed the confirmation order would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the bankruptcy court") (internal quotations and citations omitted). Of course, "the absence of a stay does not *compel* a finding of mootness in *all* cases." *In re Club Assocs.*, 956 F.2d at 1070 n.13 (emphasis in original); *see also In re Winn-Dixie Store*, 286 F. App'x at 624 (noting the failure to seek a stay does not "in and of itself render[] an appeal moot"). Nevertheless, the failure of a party to seek and obtain a stay designed to prevent the consummation of a settlement is clearly an important factor in any equitable mootness determination. *See In re E. Coast Beverage Corp.*, 143 F. App'x 259, 260 (11th Cir. 2005) ("[I]n light of Rotella's failure to seek a stay, the numerous transactions effectuated under that plan's provisions preclude the grant of any meaningful relief."); *In re VOIP*, 461 B.R. at 903 ("[T]he Trustee correctly points out that an important factor in its favor is the failure of the Lender Group to seek and obtain a stay to prevent the consummation of the settlement.").

Although not dispositive, Appellants' failure to pursue a stay of the Settlement Agreement's consummation is a factor that weighs heavily in favor of finding equitable mootness. In this case, the Settlement Agreement was executed over eight months ago and has been fully consummated for several months, yet Appellants have *never* requested a stay of the Bankruptcy Court's Rule 9019 Order. At least in part because of Appellants' failure to seek a stay, the many transactions effectuated under the Settlement Agreement preclude the court from granting meaningful relief.

Appellants identify several cases where a stay was not sought but the settlement was nevertheless "easily" undone. *See In re VOIP*, 461 B.R. at 903; *In re Healthco Int'l*, 136 F.3d at 49; *In re Chateaugay Corp.*, 167 B.R. at 779. However, these cases (which are not binding on this court) are easily distinguishable.[12] Unlike in those cases, there are significant reasons to believe that this Settlement Agreement is not easily undone and that the court can no longer provide effective relief to the parties. As discussed in more detail above, the court cannot grant effective relief because the Settlement Agreement cannot be unwound without throwing the case into chaos on remand.

Appellants also argue that Appellees entered into the Closing Agreement in "secret and without notice," thereby waiving a provision in paragraph 4 of the Settlement Agreement that conditioned the "Effective Date" on the Settlement Order "becoming final and non-appealable." (Doc. 13, at 6). According to Appellants, by the time that they were notified of Appellees' Closing Agreement on November 24, 2015 (*i.e.*, less than a week after its execution), "consummation of the Settlement Agreement was *fait accompli*." (*Id.*). However, nothing

---

[12] For example, in *In re VOIP*, the court addressed a settlement agreement that contemplated a single claim that "involved the transfer of money, not the conveyance of real property." 461 B.R. at 903. In contrast, here, many parties are affected by the Settlement Agreement – the real property interest in the Quarry has been transferred, Debtor's business operations have ceased, various releases have been granted, and state court judgments have been obtained.

prohibited Appellees from waiving the effective-date condition, and the record on appeal reveals that Appellants were on notice that time was of the essence to Appellees in consummating the Settlement Agreement. Specifically, at the Rule 9019 Hearing, Appellees made it abundantly clear that the Settlement Agreement only made sense to TBGS if TBGS could get immediate access to the Quarry and "get working." (Doc. 3-30, at 76:4-5 ("I mean , really we [TBGS] have got to get out there *tomorrow* getting marble and working." (*emphasis added*)).  Appellants cannot now claim that Appellees surreptitiously sped up efforts to transfer control of the Quarry to TBGS by waiving the effective-date conditions.  Regardless, even after being notified *by Appellees* about the Closing Agreement's execution, Appellants made no effort to respond or seek any stay.[13]  Therefore, the court concludes that Appellants' failure to seek a stay, has at least in part, resulted in the complete consummation of the Settlement Agreement, thereby preventing the court from granting effective relief. *E.g.*, *In re Winn-Dixie Store*, 286 F. App'x at 623.

The court is aware of the view that the doctrine of equitable mootness was developed for purpose of (and should only be used when) "granting relief on appeal is almost certain to produce a perverse outcome — chaos in the Bankruptcy Court from a plan in tatters and/or significant injury to third parties." (Doc. 13, at 2) (quoting *Bennett v. Jefferson County*, 518 B.R. 613, 634 (Bankr. N.D. Ala. 2014)).  The court agrees that the application of the doctrine should be so limited.  The record of appeal demonstrates that the challenged Settlement Agreement has been fully consummated, in part because of Appellants' own actions.  The court can no more provide effective relief in this matter than it can undo the Settlement Agreement and return the parties to the *status quo*.  If Appellants were granted the relief that they seek and the court

---

[13] To be sure, the record of appeal is clear that Appellees did not unlawfully rush to consummate their agreement. The Eleventh Circuit has upheld dismissals grounded in equitable mootness with even more truncated timelines than this. *See, e.g.*, *In re Allied Holding*, 291 F. App'x 257 (appeal filed three days after Chapter 11 plan confirmation; one month later, appellants sought a stay in Bankruptcy Court but never sought a stay in district court; three months after plan confirmation, appeal denied as equitably moot).

attempted to unwind all or part of the Settlement Agreement, the relief would undermine the reasonable expectations of the parties who carefully negotiated and relied on the deal struck by the Settlement Agreement. Accordingly, the appeal is equitably moot.

### IV. Conclusion

For the forgoing reasons, the court concludes that Appellees' Motion (Doc. 7) is due to be granted and this appeal is due to be dismissed.

A separate order will be entered.

**DONE** and **ORDERED** this July 20, 2015.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE